Nicholas G. GHARZOUZI, Plaintiff,

v.

NORTHWESTERN HUMAN SERVICES OF PENNSYLVANIA, Richard Thomas, John Ceverdom, Jon C. Fogle, Sally Sheaffer, Alan Tezak and Joanne Edwards, Defendants.

No. 01–CV–192.

United States District Court,
E.D. Pennsylvania.

May 6, 2002.

**516**

Jeffrey L. Pettit, Phillips & Phelan, Philadelphia, PA, for Defendants.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

Plaintiff Nicholas Gharzouzi ("Gharzouzi") has brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("PHRA"), alleging that Defendants Northwestern Human Services of Pennsylvania ("NHS"), Richard Thomas ("Thomas"), John Ciavardone ("Ciavardone")[1], Jon C. Fogle ("Fogle"), Sally Sheaffer ("Sheaffer"), Alan Tezak ("Tezak") and Joanne Edwards ("Edwards") discriminated against him on the basis of his Lebanese national origin. Defendants have moved for summary judgment as to all counts of Plaintiff's Amended Complaint, including Plaintiff's disparate treatment, hostile work environment and retaliation claims brought under Title VII and the PHRA and Plaintiff's claim for emotional distress damages.

This Opinion considers Defendants' Motion for Summary Judgment, filed on March 19, 2002; Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, filed on April 12, 2002; and Defendants' Reply Brief in Support of Motion for Summary Judgment, filed on April 17, 2002. We have jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1334 and 1367.

### II. STANDARD OF REVIEW

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions

David L. Deratzian, Nancy S. Skalangya, Hahalis & Kounoupis, P.C., Bethlehem, PA, for Plaintiff.

---

1. We note that the caption in this case appears to misspell Defendant Ciavardone's name as "Ceverdom." Hereinafter, other than in the caption contained in the Order following this Opinion, we use the spelling supplied by Defendants, Ciavardone.

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202. All inferences must be drawn, and all doubts resolved, in favor of the non-moving *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

On motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Id.* at 321 n. 3, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (quoting Fed.R.Civ.P. 56(e)); *see First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co.,* 824 F.2d 277, 282 (3d Cir. 1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2505.

In discrimination and retaliation cases, proof at summary judgment follows a well-established "burden-shifting" approach first set forth in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this burden-shifting approach, once a plaintiff has established a prima facie case of discrimination or retaliation, the defendant must rebut an inference of wrongdoing with evidence of a legitimate, non-discriminatory or non-retaliatory reason for the action taken. *Delli Santi v. CNA Ins. Co.,* 88 F.3d 192, 199 (3d Cir.1996); *Weston v. Commonwealth of Pennsylvania,* 251 F.3d 420, 432 (3d Cir.2001). If a defendant successfully meets its burden in a discrimination or retaliation case, then in order to avoid summary judgment, the plaintiff must present evidence of pretext or cover-up, or show that discrimination played a role in the employer's decision-making and had a determinative effect on the outcome. *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994); *Weston,* 251 F.3d at 432. The ultimate burden to prove discrimination on the basis of the claimed protected class-the burden of production-remains with the plaintiff at all times. *See Barber v. CSX Distrib. Servs.,* 68 F.3d 694, 698 (3d Cir. 1995).

Notwithstanding the moving party's burden, the Third Circuit urges special caution in granting summary judgment to an employer when its intent is at issue, particularly in discrimination and retaliation cases. *Goosby v. Johnson & Johnson Med., Inc.,* 228 F.3d 313, 321 (3d Cir.2000).

### III. *FACTUAL BACKGROUND*

On September 27, 1996, the Commonwealth of Pennsylvania Department of Public Welfare contracted with a corporation now known as Northwestern Human Services of Pennsylvania ("NHS") (then called Northwestern Human Services, Inc.) to manage, administer and operate the Allentown Secure Treatment Unit ("ASTU"), a treatment center for delinquent juveniles. Defendant Thomas was selected to be the director of the ASTU; his responsibilities included hiring the per-

sonnel necessary to fulfill NHS's obligations under the contract. His direct supervisor was Defendant Tezak, the Juvenile Justice Director for NHS. In the fall of 1996, Thomas hired Gharzouzi as a Unit Life Coordinator on behalf of NHS; Gharzouzi was responsible for, among other things, safety and security concerns within the ASTU.

In January of 1999, Gharzouzi was promoted to the position of Assistant Director; he remained in this position until his termination in September of 1999. Gharzouzi complains that beginning in 1997 Thomas discriminated against him and harassed him because of his Lebanese national origin. Plaintiff complains that Thomas mocked Plaintiff's manner of communication, including his accent and his hand gestures, and also told Plaintiff that he had to change his way of thinking. Plaintiff recalls at least ten incidents of alleged discrimination. Plaintiff first alleges that on July 17, 1997, he and Thomas discussed several issues and, during this conversation when Gharzouzi asked Thomas to explain something, Thomas told him that Gharzouzi did not understand due to the language barrier. The next allegedly discriminatory incident alleged occurred in October of 1997. In his notes for a meeting held on October 30, 1997, Gharzouzi indicated that the office of two employees "will" become another employee's office and another room "will" be converted into the clinical office for the first two employees. Thomas commented to Gharzouzi that the word "will" was not appropriate and the use of the word showed "poor management skills." Gharzouzi changed the wording of the memorandum, but at that time indicated to Thomas that he was simply informing the supervisors of the change and did not mean the word to be derogatory. Gharzouzi alleges next that in February of 1998, Thomas confronted Gharzouzi during a meeting in front of co-workers; after

the meeting, Thomas asked Gharzouzi why he did not agree with Thomas and stated that Gharzouzi was not a team player. Gharzouzi alleges that several times throughout that day, Thomas mocked the way that Gharzouzi talks and the gestures that Gharzouzi makes with his body. Gharzouzi then claims that on June 3, 1999, he and Thomas disagreed over whether particular students should be required to do community service work and that in the course of the disagreement, Thomas used an expletive, stating that he was the Director. Gharzouzi also asserts that on June 11, 1999 after a group meeting where Thomas was present and where Gharzouzi got into a disagreement with a staff nurse, Thomas reprimanded him for the way that he talked to the nurse; according to Plaintiff, Thomas told him that he was reprimanding him because Thomas thought that the way that he said things to the nurse and used his hands hurt her feelings. Plaintiff next alleges that on June 17, 1999, Thomas admonished Gharzouzi for planning the day and time of a party for one of their co-workers without seeking Thomas's approval; according to Gharzouzi, Thomas stated that Gharzouzi needed to start learning "our way" of doing things and added that "the buck will stop here." Plaintiff claims that on June 26, 1999 and July 15, 1999, Thomas directed Gharzouzi three times to rewrite a memorandum that Gharzouzi had prepared and stated that he did not know how to write a memorandum because of his "English language barrier." Gharzouzi states that he has a Master's Degree and is enrolled in post-graduate courses and has never before received any criticism regarding his use of the English language; he felt that he was being discriminated against and that these criticisms were making it impossible for him to do his job. According to Plaintiff, on June 28, 1999, he and Thomas got into a dis-

agreement and Thomas told Gharzouzi that he was the director, that he did not want to hear any of Gharzouzi's ideas and that if Gharzouzi wanted to keep his job, he would have to change his way of thinking; when Gharzouzi asked Thomas how he could change, Thomas did not offer any suggestions. Plaintiff states that on August 30, 1999, Thomas confronted Gharzouzi regarding various issues, including the way that Gharzouzi expresses himself. Thomas complained of Gharzouzi's use of language, his accent, his hand gestures and the way that he looked at people. Thomas mentioned that staff members were intimidated because Gharzouzi had hurt their feelings. Gharzouzi asked for specific instances where he had hurt staff members' feelings. Thomas allegedly replied that if he did not want to work there, he could leave and that if he did not change these behaviors, he would fire him. Gharzouzi believed that Thomas was trying to make his job miserable so that he would quit.

Towards the end of August or beginning of September, a decision was made to place two ASTU residents in a room together; one of the residents assigned to the room had a history of committing sex offenses and was older and physically larger than the other resident assigned to the room. According to Plaintiff, the entire team on duty that day discussed and made the decision to assign the two residents to the room. Defendants, on the other hand, contend that several staff members objected to the idea, but that Gharzouzi refused to accept their recommendations and, as the person in charge that morning, implemented the room change.

On or about September 9, 1999, Gharzouzi called the corporate complaint hotline, which was part of the corporate compliance program. He spoke with Defendant Ciavardone, a Senior Vice–President of NHS. According to Plaintiff's de-

position, his complaint concerned "what Rick Thomas was telling me and threatening me." (N. Gharzouzi Dep. at 104.) According to Plaintiff, he stated that "Mr. Thomas said to me, if you go above me I'm going to fire you. They're going to believe me, not you." (*Id.*) Ciavardone told Gharzouzi to call Defendant Fogle, the Corporate Director of Human Resources for NHS; Plaintiff left a message for Fogle.

On the morning of September 10, 1999, Plaintiff called Thomas at home to tell him that he would not be able to make it to work that day because his knee was causing him discomfort and he did not believe that he could drive to work safely. At that time, Plaintiff had an ongoing knee condition for which he eventually had an arthroscopy. According to Plaintiff, Thomas ordered Gharzouzi to come to work and also directed him to get a doctor's excuse. Plaintiff did see his doctor that day and obtained an excuse from the doctor's office. Thomas claims that he had previously requested that Gharzouzi be at work at 7 a.m. that morning in order to help transport some of the residents to the dentist's office; according to Thomas, Gharzouzi knew that he was to tell Thomas sooner than that morning if he could not be at work that morning so that Thomas could arrange for other staff members to be present.

Also on September 10, 1999, Thomas called Defendant Sheaffer, an Employee Relations Specialist employed by NHS. According to Sheaffer, Thomas reported (1) that staff members had alleged that Gharzouzi was engaging in union activity and (2) that Gharzouzi had inappropriately directed the placement of two residents to a room. Sheaffer then called Fogle to decide how to proceed with Thomas's charges. She and Fogle decided that Fogle would inform Gharzouzi that he was

being placed on administrative leave with pay while the allegations were investigated. According to Sheaffer, the seriousness of the two charges warranted placing Gharzouzi on administrative leave. First, any involvement by Gharzouzi with union organization would undermine the management's position to remain union-free. Second, the room assignment appeared to have compromised the residents' safety. According to Sheaffer, she and Fogle decided that she would conduct her investigation by interviewing staff members. They planned that the investigation would focus on the union allegations.

Fogle left a phone message for Gharzouzi on his home answering machine. When Gharzouzi returned Fogle's phone call, Fogle informed him that he should stay at home until further notice. Gharzouzi remained on administrative leave until his termination. While Gharzouzi was on administrative leave, Sheaffer interviewed various staff members. In the course of her investigation, Sheaffer also met with Gharzouzi twice, once with Gharzouzi alone and another time with Gharzouzi, Defendant Edwards, the Director of Human Resources for NHS, and Tezak. Based upon the interviews with NHS staff members and with Gharzouzi, Sheaffer, Edwards, Tezak and Michael Breslin ("Breslin"), a Senior Vice President for NHS, decided to offer Gharzouzi the option of resigning. On September 22, 1999, they presented him with this choice and allowed him until September 24, 1999 to make his decision; when he refused to resign, NHS terminated his employment. A letter dated September 27, 1999 and signed by Edwards confirms that effective September 24, 1999, he was terminated from his position as Assistant Director.

On January 5, 2000, Gharzouzi's attorney submitted a charge of discrimination, which Gharzouzi had signed and dated December 15, 1999, to the Equal Employment Opportunity Commission ("EEOC"). This charge of discrimination indicated Plaintiff's belief that he had been discriminated against and subjected to a hostile work environment because of his Lebanese origin and retaliated against; it mentioned only Defendants NHS and Thomas by name. On this form, Plaintiff indicated that he would also like to file the charge with the Pennsylvania Human Relations Commission ("PHRC"); the cover letter dated January 5, 2000 that accompanied the charge also indicated that Plaintiff was making a request for cross-filing with the PHRC. The cover letter and charge were each stamped as received by the EEOC on January 5, 2000.

On February 11, 2000, the EEOC advised Plaintiff's counsel by letter that the charge had been received. The later stated that "before we can actually docket your client's charge and begin the EEOC investigation, we must first complete other intake processing for which we will require assistance from you and your client." The letter further stated that "you will be informed as to the decision in this matter, and, if appropriate, what additional steps must be taken in order for EEOC to complete this process." The letter assigned EEOC Investigator Genevieve Delaney ("Delaney") to the matter.

On April 14, 2000, Delaney sent a perfected draft charge to Gharzouzi; the letter indicated that he must send a signed copy of the revised charge within thirty-three days or his charge would be dismissed without an investigation or a mediation by the EEOC. This perfected draft charge included not only Defendant Thomas but also Defendants Ciavardone, Fogle, Sheaffer, Tezak and Edwards by name. The EEOC files contain two copies of this perfected charge, one signed by Gharzouzi on April 18, 2000 and date-stamped by the EEOC on April 21, 2000, and another

signed by Gharzouzi on April 26, 2000 with a May 5, 2000 cover letter from Plaintiff's counsel, both of which were date-stamped May 5, 2000. The EEOC forwarded the charge to the PHRC on May 9, 2000. The EEOC issued a Notice of Right to Sue on October 16, 2000 and Plaintiff filed his complaint in federal court within 90 days of that notice.

## IV. DISCUSSION

### A. Timeliness Issues

As a preliminary matter, we address the timeliness issues raised by Defendants in their Motion for Summary Judgment.

#### 1. Time Limits on Plaintiff's Title VII Claims

##### a. Filing Requirements Under Title VII

In order to bring suit under Title VII, a plaintiff must have exhausted his/her administrative remedies by filing a timely charge of discrimination with the EEOC. For a charge to be timely, a plaintiff must normally file his/her charge of discrimination with the EEOC within 180 days after the alleged unlawful employment practice occurred. However, in a "deferral state" like Pennsylvania, that is, a state which has a state or local law prohibiting the practice alleged and establishing or authorizing the state or local authority to grant or seek relief from practices prohibited under Title VII, the plaintiff has not 180 but 300 days from the date of the alleged unlawful employment practice to file his/her charge of discrimination with the EEOC. *See Seredinski v. Clifton Precision Prods. Co.*, 776 F.2d 56 (3d Cir.1985). The extension of the filing time to 300 days holds regardless of whether the plaintiff ever files a charge with the state agency.

*See Colgan v. Fisher Scientific Co.*, 935 F.2d 1407, 1414–15 (3d Cir.1991). Gharzouzi thus had 300 days from the date of the alleged unlawful practice to file his EEOC claim.

##### b. Defendants' Position

■ Defendants argue that Gharzouzi's EEOC filing was not effected until May 1, 2000 when the EEOC formally docketed his charge and, thus, that Gharzouzi's charge is timely only as to events occurring 300 days before May 1, 2000—that is, after July 14, 1999. Defendants accordingly argue that Plaintiff's allegations of harassment in 1997, 1998 and through July 14, 1999 are time-barred and that he should only be able to seek relief for the harassment that he alleges occurred on August 30, 1999 and September 9, 1999.[2] (Defs.' Mot. for Sum. Judg. at 17–18.)

##### c. Analysis of Timeliness of Plaintiff's Title VII Claims

We reject Defendants' argument that the charge need have been formally docketed and assigned a charge number for the filing to have been effective. We find that Plaintiff's January 5, 2000 letter and charge of discrimination constitute an effective filing with the EEOC.

###### i. Filing Requirements Under Title VII

The Third Circuit recognizes "the prevailing jurisprudence that a charge [of discrimination filed with the EEOC] need not comply with a plethora of particular requirements." *Bihler v. The Singer Co.*, 710 F.2d 96, 99–100 (3d Cir.1983). The Code of Federal Regulations provides that "a charge is sufficient when the Commission receives from the person making the

---

**2.** Our count shows July 6, 1999, not July 14, 2000, to be 300 days before May 1, 2000. Nevertheless, this discrepancy is immaterial

because, as discussed *infra* at Section IV. A.1.c.ii., the effective date of filing is January 5, 2000 and not May 1, 2000.

charge a written statement sufficiently precise to identify the parties, and to describe generally the practices complained of." *Edelman v. Lynchburg College*, 535 U.S. 106, 122 S.Ct. 1145, 1148, 152 L.Ed.2d 188 (2002) (quoting and citing 29 CFR § 1601.12(b) (1997)). A communication to the EEOC in, or reduced to, writing may constitute a charge if it provides notice to the EEOC "of a kind that would convince a reasonable person that the grievant has manifested an intent to activate the Act's machinery." *Bihler*, 710 F.2d at 99. The charge "must sufficiently inform the EEOC whether it is to investigate immediately or to await further communication from the [potential] plaintiff before investigation." *Bihler*, 710 F.2d at 100. In determining whether a particular communication evinces the requisite intent, courts consider the content and effect of the communication, including what the EEOC does upon receiving the communication. *See Gulezian v. Drexel Univ.*, No. CIV.A. 98–3004, 1999 WL 153720, at *3 (E.D.Pa. March 19, 1999). In distilled form, the case law requires that an EEOC charge contain two components: (1) a written statement precise enough to identify the parties and to describe generally the practices complained of and (2) the manifestation of an intent to activate the EEOC's mechanisms.

### ii. *Application of Law to Plaintiff's Proposed Charge*

We find that the charge submitted by Plaintiff's counsel on January 5, 2000 sufficiently describes the practices complained of and effectively evinces Plaintiff's intent to activate the EEOC's investigatory mechanisms. Plaintiff completed a "Charge of Discrimination" form and added a typewritten attachment describing the allegedly discriminatory conduct. The attachment alleges that Plaintiff was discriminated against and harassed by his supervisor on the basis of his national ori-

gin, Thomas, and that he was retaliated against for complaining about Thomas's conduct and names his employer NHS. These communications provide enough information as to the parties and as to the nature of his complaint to constitute an effective charge.

Plaintiff also has evinced his intent to activate the EEOC's involvement. He signed, dated and had notarized a form entitled "Charge of Discrimination," added an attachment detailing the basis of his complaint against NHS and Thomas, and included a cover letter entitled "RE: Gharzouzi v. Northwestern Human Services" that referenced the attached charge of discrimination. The unambiguous nature of the communications distinguishes this case from cases like *Bihler*, where the court declined to hold that the communications at issue constituted a charge of discrimination because it was not clear that the plaintiff intended to activate the EEOC. In *Bihler*, the court concluded that the plaintiff's forwarding of a carbon copy of a letter that he had mailed to his employer indicating that he intended to institute legal proceedings if the employer-company did not rehire him did not constitute a charge of discrimination for administrative EEOC purposes. Unlike in *Bihler*, here, the content of the charge form itself, the cover letter and the attachment show Plaintiff's intent to file a charge with the EEOC and to begin EEOC proceedings.

Additionally, the EEOC's response to Gharzouzi's January 5, 2000 correspondence supports our finding that the letter, charge form and attachment constitute a charge of discrimination. On February 11, 2000, the EEOC wrote to Plaintiff, indicating that before it could docket the charge and begin the EEOC investigation, the EEOC needed to complete intake processing which might require Plaintiff to pro-

vide additional information. Although the letter stated that Plaintiff might be required to redraft the charge, the letter did not in any way indicate that the EEOC considered Plaintiff's January 5, 2000 communications to be anything other than a charge of discrimination.[3] · Indeed, the letter did not state that Plaintiff was to do anything further in order to effect a charge; rather, it stated that next an EEOC investigator would contact Gharzouzi.

Contrary to Defendants' suggestions, this case differs from *Gulezian v. Drexel Univ.*, No. CIV.A. 98–3004, 1999 WL 153720 (E.D.Pa. March 19, 1999). In *Gulezian*, the plaintiff argued that his completion of an intake questionnaire at the office of the EEOC constituted a charge of discrimination. The court rejected this argument. Because "[t]he EEOC clearly alerted plaintiff that further information and follow-up on his part were required *to initiate a charge* and gave plaintiff a written notice of a future appointment for an interview concerning the *possible filing of a charge of discrimination*" (emphasis added) and then indicated that he needed to provide the agency with a written statement describing the basis for his discrimination claim, the court reasoned that the EEOC clearly did not consider the intake questionnaire to be a charge of discrimination and also concluded that no reasonable complainant could have believed it to be. *Gulezian*, 1999 WL 153720 at *3. Unlike in *Gulezian*, here,

from the start, the EEOC unequivocally and consistently referred to Plaintiff's communications as a "charge" without qualifying the initiation of a charge of discrimination as a possible future event.

Defendants point to our recent decision in *Zysk v. FFE Minerals USA. Inc.*, 225 F.Supp.2d 482 (E.D.Pa.2001) in arguing that the EEOC's failure to docket Plaintiff's January 5, 2000 correspondence and to assign it a charge number establishes that it does not constitute an effective charge of discrimination. Defendants misinterpret our opinion. Contrary to Defendants' assertions, *Zysk* does not stand for the proposition that a charge of discrimination is effective only once docketed. In fact, in *Zysk*, we considered the plaintiff to have filed an effective charge as of the date on which the EEOC received the plaintiff's complaint, not on the later date when it was assigned a charge number and formally docketed. We concluded that where the plaintiff had submitted a nine-page, detailed, sworn complaint to the EEOC, the EEOC had more than enough information to begin its proceedings based on the complaint. *See Zysk*, 225 F.Supp.2d at 488. We reasoned that "common sense dictates that Plaintiff would believe his charge was filed with the EEOC on the date the agency received his sworn, detailed complaint," *id.*, 225 F.Supp.2d at 490, and were careful there to note that the failure to fill out an official

---

**3.** We note that it is the "general practice of Commission staff members ... to prepare a formal charge of discrimination for the complainant to review and to verify, once the allegations have been clarified" and to require that the complainant submit the verified charge before the agency requires a response from the employer. *See Edelman*, 122 S.Ct. at 1150 n. 9.

The Code of Federal Regulations provide that "[a] charge may be amended to cure

technical defects or omission, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received." *Edelman v. Lynchburg College*, 122 S.Ct. 1145, 1148 n. 2 (2002) (quoting and citing 29 CFR § 1601.12(b) (1997)).

EEOC form would not render the charge ineffective. *See id.,* 225 F.Supp.2d at 489.

With respect to the docketing of the charge and the assigning of a charge number, we remarked that "[h]aving assigned Plaintiff's claims against Defendant an official Charge number ..., the EEOC gave plaintiff every reason to believe that he had complied with the requirement to file with that agency within 300 days." *Id.,* 225 F.Supp.2d at 489. We further reasoned that "Plaintiff would know that he was protected from exceeding the 300–day statutory period as of the date he learned that a charge number had been assigned to his case." *Id.,* 225 F.Supp.2d at 490. In *Zysk,* then, we spoke of the docketing of the charge not as that which rendered the complaint effective, but rather as an indicator to the plaintiff that the charge had in fact been timely filed.

Although the assigning of a charge number within the limitations period is a fairly good indicator that an effective charge has been received on time, *but see Michelson v. Exxon Research and Eng. Co.,* 808 F.2d 1005, 1010–11 (3d Cir., 1987) (holding that where the writings on file were insufficient to constitute an effective charge, a charge had not been effectively filed, despite the fact that the EEOC had assigned the case a charge number)[4], it is not, and *Zysk* does not stand for the proposition that it is, necessary for the EEOC to assign a charge number to a complaint before it is considered an effective charge of discrimination. Rather, as discussed *supra* at Section IV.A.1.c.i., what is required is that the EEOC receive a written communication from the plaintiff detailing the bases of the discrimination in a fashion sufficient to indicate his intent to activate the EEOC's investigatory mechanisms.[5]

Accordingly, we hold that Plaintiff's January 5, 2000 correspondence contains

---

4. In *Michelson,* the purported plaintiff had called the EEOC and complained to an intake officer that his employer had discriminated against him on the basis of his age. The intake officer made a written record of the allegation, and a charge number was assigned, but the plaintiff never again contacted the EEOC. The Third Circuit decided that it was permissible that the writing was composed by the intake officer and was not personally executed by the plaintiff. However, the contents of the communication were insufficient to indicate to the EEOC that it should begin investigating especially where the EEOC indicated to the plaintiff that it would need to contact the EEOC again to provide the necessary facts in order to initiate a formal charge. Thus, we read *Michelson* to stand for the proposition that the fact that a charge number has been assigned will not save a complaint that lacks the necessary information.

5. Finding that Plaintiff's January 5, 2000 correspondence constitutes a charge of discrimination, we need not address whether the limitations period should be equitably tolled.

Had we reached the equitable tolling issue, we would have nevertheless concluded that the limitations period would have been tolled as of January 5, 2000 when the EEOC received Plaintiff's initial communications. The EEOC did not at that time, or at any later point, indicate to Plaintiff that anything further would have to be done in order for Plaintiff *to have filed an effective charge.* Although the EEOC indicated in its February 11, 2000 letter that Plaintiff might have to provide additional information or re-draft the charge, nowhere did the EEOC indicate that he would have to do anything to preserve his rights to pursue a Title VII claim. Also, at this time, he was informed that an EEOC investigator would contact him in order to complete his intake processing; with the EEOC's informing him that the next step in the process would be for EEOC personnel to contact him, the burden lay with the EEOC to complete the processing of his complaint. Plaintiff could reasonably expect that he had done all that was necessary to file an effective charge and that he need only wait for further communication from the EEOC.

enough information and sufficiently indicates his intent to constitute a charge of discrimination. All alleged acts of discrimination committed within 300 days of January 5, 2000, or after March 11, 1999, are within the 300–day limitations period.

We deny Defendants' Motion for Summary Judgment with respect to Plaintiff's Title VII claims on the grounds that they were not timely filed.

### iii. Consideration of Events Falling Outside of Limitations Period

The only allegedly unlawful employment practices that fall outside of this time period are the three incidents that occurred on July 17, 1997, October 30, 1997 and in February of 1998. We consider whether there is any basis upon which these three events may nevertheless be considered with respect to either Plaintiff's retaliation claim or hostile work environment claim. Taking Plaintiff's retaliation claim first, although the 1997 and 1998 events relate to retaliation claim insofar as plaintiff might want to refer to them in order to provide a context for this claim, Plaintiff does not appear to allege that the 1997 and 1998 incidents form part of the basis for his retaliation claim.[6] Rather, the actual discriminatory acts complained of are NHS's suspension and termination of him. Each of these events relating to his retaliation claim occurred in September of 1999, well within the limitations period. Thus we need not consider whether the 1997 and 1998 occurrences may be considered for purposes of Plaintiff's retaliation claim.[7]

On the other hand, with respect to Plaintiff's hostile work environment claim,

we presume that Plaintiff's position is that all of the events, including the 1997 and the 1998 incidents, form the basis for the claim. We will consider whether the 1997 and 1998 events may be considered even though they fall outside of the limitations period. We expect that Plaintiff would argue that the 1997 and 1998 events are part of an overall pattern of discrimination that worked to create a hostile work environment such that they should be considered, despite the fact that they fall outside of the limitations period.

Under the "continuing violation theory," a plaintiff "may pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir.1995). A plaintiff must meet two requirements in order to establish that a claim falls within the continuing violations theory. "First, he must demonstrate that at least one act occurred within the filing period: The crucial question is whether any *present* violation exists." *Id.* (internal quotations and citations omitted). "Next, the plaintiff must establish that the harassment is more than the occurrence of isolated or sporadic acts of intentional discrimination. The relevant distinction is between the occurrence of isolated, intermittent acts of discrimination and an on-going pattern." *Id.* at 755 (internal quotations and citations omitted). "Once the plaintiff has alleged sufficient facts to support use of the continuing violation theory, ... the 300–day

---

6. The 1997 and 1998 occurrences are particularly remote with respect to Plaintiff's retaliation claim; the protected activity, Gharzouzi's lodging of a complaint against Thomas, occurred *after* these events in 1997 and 1998.

7. Even if we were we to consider the 1997 and 1998 events, Plaintiff would be unable to

make out the prima facie retaliation showing with respect to these events; plaintiff would be hard pressed to show the necessary causal link, *see infra* at Section IV.B.2.b., since these events occurred long before the protected activity.

filing period becomes irrelevant—as long as at least one violation has occurred within that 300 days. Plaintiff may then offer evidence of, and recover for, the entire continuing violation." *Id.*

We find that Plaintiff has shown the existence of a present violation and meets the first prong of the continuing violation test. Indeed, Plaintiff alleges that several events occurred in June, July, August and September of 1999 that created a hostile work environment—all of which fall within the limitations period. However, we find that Plaintiff fails to establish the second prong of the continuing violation doctrine, that the events that occurred in 1997 and 1998 were part of a persistent and an ongoing pattern of discrimination. The next allegedly discriminatory act occurred in June of 1999, nearly two years from the July 17, 1997 event, more than a year-and-a-half from the time of the October 1997 event and over a year from the time of the February 1998 incident. The lapse of time between the 1997 and 1998 events and the events that occurred within the limitations period in the summer of 1999 is too great to support the application of the continuing violation theory with respect to the events in 1997 and 1998 falling outside the 300-day filing period.

The 1997 and 1998 events are outside of the limitations period. We hold that any consideration of these events is barred.

### 2. *Timeliness of Plaintiff's PHRA Claims*

#### a. *Filing Requirements Under PHRA*

▮ To bring suit under the PHRA, a plaintiff must have first filed an administrative complaint with the PHRC within 180 days of the date of the alleged act of discrimination. 43 PA. CONS.STAT. §§ 959(h).[8] Absent circumstances justifying equitable tolling, if no complaint is filed with the PHRC within this time, then the plaintiff is precluded from seeking judicial relief. *See Woodson v. Scott Paper Co.,* 109 F.3d 913, 925 (3d Cir.1997). In such a case, the court is deprived of jurisdiction over the PHRA claim. *See Parsons v. Philadelphia Office of Drug and Alcohol Abuse,* 833 F.Supp. 1108, 1112 (E.D.Pa. 1993). This filing requirement is strictly interpreted and enforced. *See Woodson,* 109 F.3d at 925.

#### b. *Defendants'* Position

▮ Defendants argue that because the PHRC did not receive Plaintiff's charge of discrimination until May 9, 2000, more than 180 days after the date of Plaintiff's termination, Plaintiff's PHRA claims are thus time-barred and may not be considered by this court. (Defs.' Mot. for Sum. Judg. at 19–21.) Plaintiff responds that his January 5, 2000 filing with the EEOC constitutes a contemporaneous filing with the PHRC pursuant to the work sharing agreement between the EEOC and the PHRC; he argues that having filed on January 5, 2000—within 180 days of the date of his termination, September 24, 2000—he has preserved his claims under the PHRA. (Pls.' Response to Defs.' Mot. for Sum. Judg. at 10–11.)

#### c. *Analysis of Timeliness of Plaintiff's PHRA Claims*

##### i. *Filing Requirements Under PHRA*

We recognize that the mere filing of a charge with the EEOC is insufficient to satisfy the exhaustion requirements under

---

8. In *Zysk v. FFE Minerals USA, Inc.,* No. 00–5874, 2001 WL 1736453 (E.D.Pa. Dec. 14, 2001), we clarified that the work sharing agreement between the EEOC and the PHRC does not change Pennsylvania's statute of limitations; a plaintiff must still file his charge of discrimination within 180 days with either the EEOC or the PHRC in order to preserve the state claims under the PHRA. We reiterate that holding here.

the PHRA. *See Woodson*, 109 F.3d at 926. However, a plaintiff need not file separately with the PHRC in order for the state administrative remedies to be exhausted; the state law exhaustion requirements may be satisfied if a complaint filed with the EEOC is forwarded by the EEOC to the PHRC. *See id.* at 928. As a general rule, if the PHRC does not receive the complaint within 180 days from the date of the alleged act of discrimination, whether filed with the PHRC directly or filed first with the EEOC and later transmitted by the EEOC to the PHRC, the plaintiff is precluded from pursuing claims under the PHRA. *See id.*, 109 F.3d at 927. However, the PHRA statute of limitations is subject to equitable tolling. Where a plaintiff files a charge of discrimination with the EEOC within 180 days from the discriminatory act and also clearly indicates in his/her submission to the EEOC that he/she is requesting cross-filing with the PHRC, the plaintiff may be allowed under equitable tolling principles to pursue the PHRA claims even if the complaint, due to a delay in the transmission of the charge from the EEOC to the PHRC, is forwarded, and arrives at, the PHRC after 180 days from the date of the discriminatory act have passed. Courts have held that the limitations period may be equitably tolled if the plaintiff indicates in the filing that is received by the EEOC within 180 days but is transmitted to the PHRC after 180 days his/her intent to dual-file, by checking the box on the EEOC form requesting that the complaint be cross-filed or so stating elsewhere, for instance, in a cover letter. *See, e.g., Woodson*, 109 F.3d at 926 n. 12 ("In this regard, we note that [plaintiff] Woodson's case would be quite different if he had marked the box for the EEOC to cross-file and the EEOC had failed to transmit the charge because of a breakdown in the administrative system.)"; *Carter v. Philadelphia Stock Exch.*, No. CIV.A. 99–2455, 1999 WL 715205, at *1

(E.D.Pa. August 25, 1999) (holding that failure of EEOC to transmit charge to PHRC within limitations period was subject to equitable tolling where plaintiff requested cross-filing in the cover letter attached to the EEOC charge, on the first page of the charge itself and on an official form used by the EEOC for requests for dual-filing); *Forsburg v. Lehigh Univ.*, No. CIV.A. 98–CV–864, 1999 WL 124458, at *8 (E.D.Pa. March 4, 1999) (finding plaintiff had exhausted administrative remedies under PHRA by filing a timely complaint with the EEOC where plaintiff checked box on EEOC form requesting cross-filing with the PHRC despite the fact that EEOC did not transmit the charge to the PHRC until after the expiration of the limitations period); *Brennan v. Nat'l Tel. Directory Corp.*, 881 F.Supp. 986, 998 (E.D.Pa.1995) (finding equitable tolling appropriate where plaintiff indicated in her EEOC claim that the matter was to be filed with the PHRC but for reasons beyond her control the cross-filing did not occur).

ii. *Application of Law to Plaintiff's Charge*

Here, Plaintiff submitted his charge to the EEOC on January 5, 2000, within the 180–day filing PHRA filing period, but the EEOC transmitted the charge to the PHRC on May 9, 2000, outside of the 180–day filing period. Despite the fact that Plaintiff's complaint was transmitted to the PHRC outside of the limitations period, we find that the limitations period was equitably tolled. We find that Plaintiff's communications sufficiently indicated his intent to dual-file. Plaintiff requested on the charge of discrimination form submitted by him to the EEOC and date-stamped as received by the EEOC on January 5, 2000 that the complaint also be filed with the PHRC. Plaintiff also indicated in his cover letter accompanying the form and date-stamped as received by the EEOC on Jan-

uary 5, 2000 that he was requesting cross-filing. Having filed the January 5, 2000 charge with the EEOC 103 days after the allegedly discriminatory act, Plaintiff could reasonably expect that his charge would be cross-filed within the 180–day period; the failure to meet the deadline for transmission to the PHRC was not his fault.[9]

Having found that the EEOC's failure to transmit the charge to the PHRC within the 180–day period will not bar Plaintiff's claims based on the allegedly discriminatory acts occurring within that time period, we note that within the PHRA limitations period are all events that occurred 180 days prior to January 5, 2000, or, in other words, all the events that occurred between July 9, 1999 and January 5, 2000. We deny Defendants' Motion for Summary Judgment as to Plaintiff's PHRA claims on the grounds that the charge was not timely filed.

### iii. Consideration of Events Falling Outside of PHRA Limitations Period

Falling outside of the limitations period are the 1997, 1998, June 3, 1999, June 11, 1999, June 17, 1999, June 26 and June 28, 1999 events. Plaintiff's PHRA claims may not be based on these events unless they meet the continuing violation theory. As noted *supra* at Section IV.A.1.c.iii., each of the acts that Plaintiff alleges constitutes retaliation occurred in September of 1999; these acts are all within the 180–day PHRA limitations period and may form the basis of Plaintiff's claims. However, Plaintiff's hostile work environment claim includes the acts that occurred prior to

July 9, 1999. For the same reasons discussed *supra* at Section IV.A.1.c.iii., the 1997 and 1998 events cannot be considered under a continuing violation theory; these acts are too remote in time from the events falling within the limitations period and are not sufficiently persistent to satisfy the second prong of the continuing violations theory.

■ However, we find that for purposes of the PHRA, the events occurring before July 9, 2000 in June of 1999 satisfy the continuing violations criteria for purposes of Plaintiff's hostile work environment claim. There was a sufficient number of events in June (5 alleged), and these occurred on a sufficiently consistent basis (roughly a week apart) and close enough to the conduct that is within the limitations period to meet the continuing violation requirements. Therefore, we find that Plaintiff may base his PHRA hostile work environment claim on the incidents occurring in June of 1999, even though they technically fall outside of the limitations period. Assuming that Plaintiff can make out the hostile work environment elements, Plaintiff may then offer evidence of, and recover for, the entire continuing violation beginning in June of 1999 and continuing until his termination.[10]

### 3. Timeliness of PHRA Claims With Respect to Individually Named Defendants

### a. Defendants' Position

Defendants argue that even if the January 5, 2000 charge is considered the date that Plaintiff's charge was effected, the

---

9. We caution that had Plaintiff filed his charge with the EEOC within, for example, days of the close of the limitations period, we may have found equitable tolling not to apply. In such a case, a plaintiff should not expect that the charge will necessarily be cross-filed within the limitations period.

10. We note that once events are allowed under the continuing violation theory, "the Federal Rules of Evidence and the substantive law at issue, rather than the statutory filing period, should govern the evidentiary determinations of the trial court." *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 755 (3d Cir. 1995).

January 5, 2000 charge is not effective against Defendants Ciavardone, Fogle, Sheaffer, Tezak and Edwards for purposes of the PHRA because Plaintiff's January 5, 2000 communications named only NHS and Thomas, and not the other defendants. Plaintiff's argument appears to be that Pennsylvania administrative remedies were not exhausted with respect to these additional defendants because the charge that named them arrived at the PHRC on May 9, 2000, more than 180 days after the allegedly discriminatory practice and therefore outside of the limitations period.[11]

b. *Filing Requirements Under PHRA*

"The filing of a charge before the EEOC [and, similarly, the transmission of the charge to the PHRC] serves to notify the charged party of the alleged violation and also bring the party before the EEOC [or the PHRC] to provide an avenue for voluntary compliance without resort to litigation." *Fuchilla v. Prockop*, 682 F.Supp. 247, 256 (D.N.J.1987) (*citing Glus v. G.C. Murphy Co.*, 562 F.2d 880, 888 (3d Cir. 1977)). The Code of Federal Regulations provides that " 'a charge is sufficient when the Commission receives from the person

making the charge a written statement sufficiently precise to identify the parties, and to describe generally the practices complained of.' " *Edelman v. Lynchburg College*, 535 U.S. 106, 122 S.Ct. 1145, 1148, 152 L.Ed.2d 188 (2002) (quoting and citing 29 CFR § 1601.12(b) (1997)).

c. *Application of Law to Plaintiff's PHRA Claims Against Individual Defendants*

■ Plaintiff's January 5, 2000 letter and charge mention only NHS and Thomas do not identify the additional parties. It is not sufficient to constitute a charge of discrimination against them. The record indicates that the first time that Ciavardone, Fogle, Sheaffer, Tezak and Edwards are mentioned in a charge is in the April 14, 2000 perfected draft charge signed by Plaintiff on April 18, 2000, date-stamped as received by the EEOC on April 21, 2000 and forwarded to the PHRC on May 9, 2000. Whether we use April 14, April 18, April 21 or May 9 as the date that the charge naming these additional plaintiff was effected, the charge is outside of the 180–day limitations period. Accordingly, the PHRA claims against these defendants are time-barred.[12]

11. We note that Title VII claims may not be brought against individual employees; under Title VII, Plaintiff can only state a claim against NHS and cannot state a claim (and does not appear to attempt to) against the individual defendants. *See Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1077 (3d Cir.1996) (holding that individual employees are not liable under Title VII). Therefore, we need not engage in a similar analysis with respect to Plaintiff's Title VII claims.

Unlike under Title VII, under the PHRA, individual employees may in some instances be proper defendants. Section 5(a) of the PHRA, 43 PA. CONS. STAT. § 955(a), the PHRA's employment discrimination provision, declares only that "any employer" may be held liable. Individual employees are defined separately from employers and thus

cannot be held liable under this section. *See Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 552 (3d Cir.1996). Like Title VII, the definition of an "employer" cannot be construed to include "employees." *See Dici*, 91 F.3d at 552. However, a different section of the PHRA extends beyond Title VII and contemplates liability against individual employees. Under Section 5(e), 43 PA. CONS. STAT. § 955(e), liability can be imposed on an individual who aided, abetted, incited, compelled or coerced a discriminatory employment act pursuant to Section 5(e), PA. CONS. STAT. § 955(e).

12. We note also that this case does not fall within the category of cases forming an exception to the general rule that an employment discrimination action may not be brought against a party not named in the EEOC complaint. Here, the circumstances

In addition, principles limiting the exercise of pendant jurisdiction counsel against allowing Plaintiff's PHRA claims to go forward here. Although pendent party jurisdiction may be used in the federal employment context, *see Stack v. Turnage*, 690 F.Supp. 328, 333 (M.D.Pa.1988), case law establishes that courts ought not exercise pendent jurisdiction over state-law claims against individuals not properly named in the administrative charge. *See Duva v. Bridgeport Textron*, 632 F.Supp. 880, 885 (E.D.Pa.1985). As one district court has remarked,

> Congress has expressed a strong policy in favor of fostering reconciliation of discrimination complaints. This policy is embodied in an elaborate procedural mechanism which circumscribes the jurisdiction of district courts. Both the policy and its implementing mechanism could be subverted by exercising jurisdiction over state-law claims [against individuals not named in the administrative charge].

> A complainant could partially by-pass the administrative stage simply by naming only one party as a respondent before the EEOC and then styling claims against other parties as state-law claims arising out of a nucleus of operative fact that is common with the claim presented to the EEOC. *Duva*, 632 F.Supp. at 885.

Accordingly, we grant summary judgment as to Plaintiff's PHRA claims in favor of Defendants Ciavardone, Fogle, Sheaffer, Tezak and Edwards; the PHRA claims remain against NHS and Thomas only.

### 4. *Validity of Claims Against Northwestern Human Services of Pennsylvania*

Defendants argue that Gharzouzi's claims against Northwestern Human Services of Pennsylvania are barred by the statute of limitations. Section 706(f) of Title VII imposes a ninety-day statute of limitations once the notice of right-to-sue letter is issued. Defendants contend that Plaintiff's claims against NHS of PA are time-barred because this notice issued on October 16, 2000 and NHS of PA was not named as a defendant in this action until October 22, 2001 when Gharzouzi filed an amended complaint with leave of this Court.

Defendants present in their Motion for Summary Judgment the same issues that this Court's order dated October 10, 2001 resolved. In our order, we granted Plaintiff "leave to amend his complaint to name the Defendant as 'Northwestern Human Services of Pennsylvania f/k/a Northwestern Human Service Inc. f/k/a Children's Reach a/k/a/ and t/a Northwestern Human Services, and Northwestern Human Services Inc. f/k/a The Northwestern Corporation a/k/a and t/a Northwestern Human Services.'" We noted that there "leave to amend pleadings pursuant to Rule 15 shall not be given where such amendment would be futile" and recognized that "an amendment would be futile if a plaintiff is trying to add defendants after the statute of limitations period has expired." *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Jablonski v. Pan American World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir.1988). We also noted that "had Plaintiff attempted to commence suit

---

that can warrant the bringing of an action against the parties not initially named in the EEOC complaint, for example, when there exists an identity of interests between the named and unnamed party or when the un-

named party has represented to the plaintiff that it must relate to the party though the unnamed party, are not present. *See Glus*, 562 F.2d at 888.

against Northwestern Human Services of Pennsylvania on September 21, 2001 (the date when plaintiff moved to amend his complaint), his claim would be time barred under 42 U.S.C. § 2000e–5(f)." However, we found that "plaintiff's amended complaint against Northwestern Human Services of Pennsylvania relate[d] back to the timely commencement of this action on January 12, 2001 pursuant to FRCP 15(c) and [was] thus not in violation of the statute of limitations." In finding that the amended complaint related back to the commencement of the action on January 12, 2001, we found that the requirements of FRCP 15 were satisfied. We first found that "Northwestern Human Services of Pennsylvania ha[d] received notice of institution of this action because its parent corporation and director ha[d] been named as defendants." Further, we found that "Northwestern Human Services of Pennsylvania knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against it." We reiterate these findings today. To state our conclusion otherwise, we find that within the requisite time period NHS of PA not only had notice of the lawsuit against Northwestern Human Services, but also had notice that Gharzouzi intended to join it, NHS of PA, in the case. Accordingly, we deny Defendants' motion for summary judgment with respect to their claim that Plaintiff's federal claims against NHS of PA are time-barred.

### B. *Title VII Claims*

Title VII "makes it unlawful for an employer 'to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir.1999) (citing 42 U.S.C. § 2000e–2(a)(1)). Plaintiff alleges under Title VII that he was subjected to a hostile work environment because of his national origin and was retaliated against for engaging in a protected activity.[13] We consider each of Plaintiff's Title VII claims in turn.

#### 1. *Hostile Work Environment Claim*

#### a. *Nature of Hostile Work Environment Claim*

The Supreme Court has "repeatedly made clear that although the statute [Title VII] mentions specific employment decisions with immediate consequences, the scope of the prohibition is not limited to economic or tangible discrimination and that it covers more than 'terms' and 'conditions' in the narrow contractual sense." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotations and citations omitted). The Court thus recognized in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) that sexual harassment so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an

---

**13.** Plaintiff's complaint can be read to contain a disparate treatment claim under Title VII and under the PHRA. And, indeed, Defendants argue that summary judgment should be granted in their favor with respect to any disparate treatment claim. Plaintiff's Response to Defendants' Motion for Summary Judgment addresses only Defendants' arguments with respect to Plaintiff's hostile work environment claim and retaliation claim. We take the absence of any argument on any possible disparate treatment claim to signal that Plaintiff considers all of his discrimination claims to be encompassed by the hostile work environment and retaliation claims and that he is not in fact pursuing a disparate treatment discrimination claim. Accordingly, we will grant summary judgment in Defendants' favor with respect to the Title VII and PHRA disparate treatment claim.

abusive working environment" violates Title VII. *See Meritor,* 477 U.S. at 67, 106 S.Ct. 2399. First recognized by the Supreme Court in *Meritor,* a case in which the plaintiff claimed sexual harassment, the hostile work environment doctrine "is now established as a basis for various discrimination claims," *Cardenas v. Massey,* 269 F.3d 251, 260 (3d. Cir.2001), including claims based on national origin. *See generally Cardenas,* 269 F.3d 251 (analyzing hostile work environment claim based on the plaintiff's status as a Mexican–American); *Abramson v. William Paterson College of New Jersey,* 260 F.3d 265, 277 n. 5 (3d Cir.2001) (noting that the Third Circuit has construed Title VII to support claims of a hostile work environment with respect to national origin).

### b. *Court's Inquiry into Hostile Work Environment Claim*

A court considering a Title VII hostile work environment claim must generally consider "all circumstances regarding a plaintiff's employment, including the frequency and severity of any discriminatory conduct, the physically threatening or humiliating or offensive nature of such conduct, and the effect on the plaintiff's performance and psychological well-being." *Koschoff v. Henderson,* 109 F.Supp.2d 332, 345 (E.D.Pa.2000) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The Third Circuit requires that a plaintiff alleging hostile work environment under Title VII show five conditions:

(1) the employee suffered intentional discrimination because of his or her protected class (here, national origin);

(2) the discrimination was pervasive and regular;

(3) the discrimination detrimentally affected the plaintiff;

(4) the discrimination would detrimentally affect a reasonable person of the

same national origin in that position; and

(5) the existence of respondeat superior liability.

*Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990).

In considering whether Gharzouzi has established the elements of a hostile work environment claim, "the record must be evaluated as a whole" to decide whether he has proved his case because "particularly in the discrimination area, it is often difficult to determine the motivations of an action ... A discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Cardenas,* 269 F.3d at 260–61 (internal quotations and citations omitted). Indeed, as the Third Circuit notes, "the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment." *Id.,* 269 F.3d at 261–62.

### c. *Defendants' Position*

■ Defendants argue that summary judgment should be granted in favor of Defendants on Gharzouzi's hostile work environment claim because Plaintiff fails to establish the necessary elements for a hostile work environment claim. First, Defendants argue that Plaintiff cannot show that the acts that Plaintiff alleges constitute harassment were in fact "motivated by an animosity for Lebanese people;" they argue that the incidents were "simply admonitions by a supervisor, Rick Thomas, [for Gharzouzi] to correct his behavior." (Defs.' Mot. for Sum. Judg. at 31.) Defendants likewise argue that Gharzouzi fails to demonstrate that the alleged harassment was pervasive and regular. (*Id.* at 32.) Defendants further argue that "even if the

number and content of these conversations were enough to portray a pervasive, hostile environment, there is no evidence Gharzouzi was affected." (*Id.* at 32–33.) Defendants finally argue that "any reasonably objective person with Gharzouzi's background would not have perceived Thomas's comments as discriminatory." (*Id.* at 33.)

d. *Gharzouzi's Allegations*

Gharzouzi points to eight incidents that he alleges created a hostile work environment.[14] First, Gharzouzi alleges that on June 3, 1999, he and Thomas got into an argument about whether particular students should be required to perform community service. According to Gharzouzi, Thomas, who believed that the students should not be required to do community service, told Gharzouzi, who believed that the students should do community service, that Gharzouzi's education was old and not up-to-date on this topic and also stated with the use of an expletive that he [Thomas] was the director. Plaintiff next alleges that on June 11, 1999, Thomas reprimanded him for the way he spoke to the staff nurse, saying that he believed that Gharzouzi had hurt her feelings; Thomas mentioned the way that Gharzouzi said things, the way that he used his hands, the way that he looked at her and his voice. According to Gharzouzi, on June 17, 1999, after Gharzouzi planned an office party for a co-worker, Thomas reprimanded Gharzouzi for planning the party without his approval and told Gharzouzi that he needed to start learning "our" way and added that the "buck will stop here." On June 26 and July 15, 1999, Thomas directed Gharzouzi to rewrite a memorandum, allegedly telling him that he did not know how to write a memorandum due to his "English

language barrier." Gharzouzi stated that he felt at this time as though he was being harassed and that Thomas was making it impossible for him to do his job and was creating unhealthy working conditions. On June 28, 1999, Plaintiff alleges that Thomas confronted him regarding union issues and stated that he [Thomas] directed the place, that he did not want to hear any of Gharzouzi's ideas and that if Gharzouzi still wanted to have a job at NHS, he would have to change his way of thinking. On August 30, 1999, according to Plaintiff, Thomas confronted Gharzouzi at which time Thomas mentioned the problem that he had with the way Gharzouzi talks, uses his hands and his accent. At this time, according to Gharzouzi, Thomas told him that he could leave if he did not want to work there. Finally, in September of 1999, Thomas confronted Gharzouzi about the room assignment decision. Gharzouzi explained that it was a team decision and Thomas allegedly replied that he was the director and that Gharzouzi had made a decision without being a team player. Gharzouzi alleges that Thomas stated that "the buck will stop here" and made other statements about Gharzouzi's culture and mocked his accent and the use of his hands that Gharzouzi considered harassment.

Gharzouzi's deposition also indicates that Thomas "mocked my accent, the way I talk, the way I explain things. He mentioned to me numerous times the language barrier, numerous times told me this is America, we have to learn America's culture. Every time I talked to him about something, he mocks me, you know the way he repeats what I said, but in different language. He makes fun about my body language; he makes fun about my

---

**14.** Gharzouzi actually alleges three more incidents than are discussed here; as noted *supra* at Section IV.A.1.c.iii., three of the incidents upon which Gharzouzi relies occurred in 1997 and 1998, outside of the limitations period.

decision-making." (N. Gharzouzi Dep. at 49.)

Gharzouzi's hostile environment claim, then, is based upon the series of verbal encounters between him and Thomas spanning from June 3, 1999 until his termination in September of 1999. We consider whether Plaintiff meets each of the five conditions necessary under *Andrews* to establish a hostile work environment claim.

e. *Application of Andrews to Plaintiff's Hostile Work Environment Claim*

i. *Existence of Intentional Discrimination*

Verbal ... harassment, no matter how unpleasant and ill-willed, is not prohibited by Title VII if not motivated by the plaintiff's membership in some protected group. *See Koschoff v. Henderson,* 109 F.Supp.2d 332, 346 (E.D.Pa.2000). Mistreatment that is not motivated by the plaintiff's protected class does not create a hostile environment. *See id.* Conduct motivated by a bad working relationship is not prohibited by Title VII. *See id.* "Nor are an employer's actions when based upon a belief, even if mistaken, that an employee was insubordinate or otherwise acted improperly." *Id.* "Likewise, seemingly discriminatory behavior when actually motivated by personal animosity is not prohibited by Title VII." *Id.* Moreover, however inappropriate, "racial comments that are sporadic or part of casual conversation do not violate Title VII." *Al–Salem v. Bucks County Water & Sewer Auth.,* No. 97–6843, 1999 WL 167729, at *5 (E.D.Pa. March 25, 1999) (internal quotations and citations omitted). Rather, "[f]or racist comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racist slurs, there must be a steady barrage of opprobrious racial comments." *Id.*

Nevertheless, a plaintiff need not demonstrate direct evidence of the alleged harasser's motivation for discrimination against him. *See Abramson v. William Paterson College of New Jersey,* 260 F.3d 265, 277–78 (3d Cir.2001). The first prong of the *Andrews* test does not require factfinder "to peer inside the harasser's mind," but "merely requires a showing that the offender's behavior was ... based on a protected category." *Id.* Because "discrimination is often masked in more subtle forms, it is often difficult to discern discriminatory animus" and "with respect to certain conduct, the intent to discriminate can be inferred." *Id.* (internal quotations and citations omitted).

We are cognizant of the fact that courts are not to consider the events that allegedly constitute a hostile environment in isolation. *See supra* at Section IV.B.1.b. Nevertheless, with respect to the first *Andrews* prong, courts will frequently look to see whether each of the alleged events can be said to have been motivated by discriminatory reasons. *See, e.g., Al–Salem,* 1999 WL 167729 at *6–7 (considering individually each of the events that allegedly constituted harassment). Having done this, we find as a matter of law, based on the record before us, that a jury could not reasonably find Thomas's comments on June 3, 1999 and June 28, 1999 to be motivated by improper discriminatory animus. Gharzouzi can point to nothing in these conversations showing discriminatory animus. The record shows that on both June 3 and June 28, respectively, Thomas approached Gharzouzi regarding legitimate employment-related concerns, namely whether residents should be required to engage in community service and whether Gharzouzi was involved in union organizing. With respect to the June 3 incident, Thomas's comments appear to be an attempt to explain to Gharzouzi that he believed that his approach to community ser-

vice was misguided. Absent some showing that his conduct was actually motivated by improper discriminatory reasons, a supervisor like Thomas may express his dissatisfaction with an employee's philosophy or methodology. Although his words may reflect contempt for his subordinate, the fact that Thomas may have utilized an expletive, without more, does not establish that his words were improperly motivated. *See Al–Salem,* 1999 WL 167729 at *6 (deciding that although the supervisor's remark "look at me now ... I'm your supervisor" may have been arrogant or presumptuous and may have reflected a certain scorn for formal education and a distaste for the college educated, one could not reasonably find that remark was made because of the protected class to which plaintiff belonged). Similarly, with respect to the June 28, 1999 incident, Thomas's remarks, without anything more, reflect only his concern that Gharzouzi's participation in union organization was improper. A supervisor in Thomas's position is entitled to express his disapproval of such conduct; as noted *supra,* the fact that Thomas's belief may be mistaken does not change the analysis. Similarly, the fact that Thomas chose harsh words does not establish the first *Andrews* element; without more, they at best show Thomas's personal dislike for Gharzouzi—that which is not actionable. Accordingly, we find that with respect to these two incidents, the first *Andrews* prong is not satisfied.

As opposed to the June 3 and June 28 incidents, the June 11, 17, and 26 1999; the July 15, 1999; the August 30, 1999 and the September 1999 incidents present a closer question with respect to the first prong of *Andrews.* Each of the remarks made on these days is seemingly neutral; that is, Thomas did not refer explicitly to Plaintiff's Lebanese origin. Nevertheless, even words that appear facially neutral may meet the first prong of the *Andrews* test if it can otherwise be shown that they

were motivated by discriminatory animus. *See, e.g., Howley v. Town of Stratford,* 217 F.3d 141 (2d Cir.2000) (finding hostile work environment claim survived where conduct at issue, though lacking any sexual component or reference to the plaintiff's sex, could, under the circumstances of the case, reasonably be interpreted as having been motivated by plaintiff's sex); *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1083 (3d Cir.1996) (holding that a jury could find an intent to discriminate from evidence of use of "code words," such as "all of you" and "one of them;" "The words themselves are only relevant for what they reveal—the intent of the speaker.").

We believe that, as opposed to the June 3 and June 28 incidents, a jury could reasonably find these other comments to be discriminatorily motivated. Despite the fact that Thomas offers what appears to be a legitimate reason for each of the discussions (e.g., Gharzouzi not acting as a "team player," Gharzouzi intimidating his co-workers, Gharzouzi writing an ineffective memorandum), a reasonable juror could find Thomas's admonition for Gharzouzi to learn "our way," his mocking of Gharzouzi's accent and hand gestures and his reference to Gharzouzi's "English language barrier" to be motivated by discriminatory animus on account of Gharzouzi's national origin. Accordingly, we find that Plaintiff has met the first *Andrews* prong with respect to the June 11, 17 and 26, 1999; the July 15, 1999; the August 30, 1999 and the September 9, 1999 incidents.

ii. *Pervasiveness and Regularity of Conduct*

Although Plaintiff has satisfied the first *Andrews* prong with respect to these incidents, we find that Plaintiff fails to meet the second "pervasive and regular"

prong.[15] In order for Plaintiff to state a hostile work environment claim, the workplace must be "permeated with discriminatory intimidation, ridicule and insult." *Harris*, 510 U.S. at 21, 114 S.Ct. 367 (*quoting Meritor*, 477 U.S. at 67, 106 S.Ct. 2399). Although "[t]here is no ready measure for frequency or severity." *Al–Salem*, 1999 WL 167729 at *7, "pervasive harassment is that which occurs regularly or when incidents are in concert with each other." *Koschoff v. Henderson*, 109 F.Supp.2d 332, 347 (E.D.Pa.2000) (*citing Andrews*, 895 F.2d at 1484). "Generally, more severe discriminatory acts need be less frequent to be considered pervasive." *Koschoff*, 109 F.Supp.2d at 347.

Even construing the record in the light most favorable to Plaintiff, we find that it does not give rise to a triable issue of fact concerning the pervasiveness and regularity of the acts that allegedly constituted a hostile work environment. Even assuming that every incident alleged by Plaintiff did occur, the incidents were far from regular. Over a three month period, Plaintiff alleges just six incidents that may be considered as the basis for his hostile environment claim.[16] Although he alleges three incidents in the month of June, he alleges only one incident each during the months of July, August and September. This is not a case where the alleged harassment is day-to-day and where the events that form the basis of his complaint span most of the relevant time period. *Compare Koschoff*, 109 F.Supp.2d at 347–48 (deciding that harassment was pervasive and regular where harassing incidents were frequently day-to-day, ongoing events and where incidents spanned the relevant time period).

This is not to say that six events occurring over a three-month period can never form the basis of a hostile work environment claim. Nevertheless, here, our conclusion with respect to this prong is also compelled by the fact that Thomas's comments to Plaintiff were *relatively* benign. Although, as we noted *supra* at Section IV. B.1.e.i., a reasonable juror *could* find a discriminatory motive behind the comments, such a finding *is not compelled* by the nature of the comments. Indeed, none of the comments refers explicitly to Plaintiff's Lebanese origin and each of the comments *could* be interpreted as reflecting nothing more than a clash of personalities. We find that the incidents alleged by Plaintiff did not permeate the workplace. Accordingly, Plaintiff fails to meet the second prong of the *Andrews* test.

### iii. Subjective Effect of Discrimination on Plaintiff

Moreover, Plaintiff has failed to put forth sufficient evidence to show that these comments actually affected his work environment. The third *Andrews* prong "is crucial to establish that a particular plaintiff suffered injury warranting judicial relief." *Koschoff*, 109 F.Supp.2d at 348 (*citing Andrews*, 895 F.2d at 1483). The effects need not be economic. *See Koschoff*, 109 F.Supp.2d at 348 (*citing Harris*, 510 U.S. at 22, 114 S.Ct. 367). Such effects may include being forced to resign or suffering emotional trauma, *id.* (*citing Andrews*, 895 F.2d at 1484), but serious psychological harm is not required. *Id.* (*citing Harris*, 510 U.S. at 21, 114 S.Ct. 367).

---

**15.** As noted in *Bouton v. BMW of N. Am.*, 29 F.3d 103, 106 n. 2 (3d Cir.1994), the Third Circuit's "pervasive and regular" condition in *Andrews* differs from the "severe and pervasive" standard articulated by the United States Supreme Court in *Meritor*. Were we to use the Supreme Court's standard, our holding would be the same.

**16.** As discussed *supra* in Section IV.B.1.e.i., the June 3 and June 28 incidents may not be considered as part of Plaintiff's hostile work environment claim.

Plaintiff points to nothing in his Brief in Opposition to Defendants' Motion for Summary Judgment showing that he was subjectively affected by his interactions with Thomas. The only references to the subjective effect of Thomas's conduct on Plaintiff that we can find in the record are two statements in a harassment questionnaire dated November 26, 1999. In the questionnaire, he indicates with respect to the June 26, 1999 and July 15, 1999 incidents where Thomas asked Gharzouzi to re-write a memorandum that "[n]ot only did I feel discriminated against, I also felt as though I was being harassed and that he [Thomas] was making it impossible to do my job and he was creating very healthy working conditions." With respect to his August 30, 1999 interaction with Thomas, he states that "I feel that he was trying to make my job so miserable for a long time so that I would quit . . ."

We find these bare assertions, without any elaboration on how Gharzouzi's job was made impossible and miserable or of how the working conditions were made unhealthy and without any substantiation, insufficient to show that Gharzouzi was detrimentally affected. *Compare Koschoff*, 109 F.Supp.2d at 348 (discussing in relation to the subjective effect prong the fact that the plaintiff's disposition changed, that she cried as a result of workplace harassment and that co-workers testified that the plaintiff had been detrimentally affected); *Smolsky v. Consol. Rail Corp.*, 780 F.Supp. 283, 295 (E.D.Pa.1991) (finding third *Andrews* factor met where record established that the plaintiff felt uncomfortable at work and suffered further problems at home). Accordingly, we find that Plaintiff has failed to make out the third *Andrews* requirement.

iv. *Objective Effect of Discrimination*

In addition, Plaintiff fails to establish the fourth *Andrews* prong. The objective effect of discrimination prong of the *An-drews* test, which requires a plaintiff to show that the discrimination would detrimentally affect a reasonable member of the same protected class in the plaintiff's position, "puts a check on the overly sensitive plaintiff who is unreasonably affected by acts of discrimination." *Koschoff*, 109 F.Supp.2d at 348 (*citing Andrews*, 895 F.2d at 1483). "Evidence that others were harassed may tend to show that a plaintiff's claims are objectively reasonable." *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 757 (3d Cir.1995). In his deposition, Gharzouzi does name two employees whom Thomas had allegedly harassed. (N. Gharzouzi Dep. at 127–29). Nonetheless, Plaintiff's bare assertion that they were harassed does not establish the objective reasonableness of the effect of Thomas's treatment of him. Plaintiff has not further substantiated the claims that they were harassed; he has not offered affidavits by them or their deposition testimony or testimony of anyone else in support of the claim that they were harassed. We conclude that Plaintiff has failed to show that the harassment that he suffered was so pervasive and regular as to change the conditions of employment of a reasonable person in Plaintiff's position.

v. *Respondeat Superior Liability*

██ Plaintiff can make out the fifth *Andrews* requirement, the existence of respondeat superior liability. "Common law principles of agency apply to limit employers' liability for their agents in Title VII actions." *Koschoff*, 109 F.Supp.2d at 348–49 (*citing Meritor*, 477 U.S. at 72, 106 S.Ct. 2399). "Nevertheless, where a hostile work environment is created by an immediate or successively higher supervisor, a prima facie case of vicarious liability by the employer exists per se." *Koschoff*, 109 F.Supp.2d at 349 (*citing Burlington Industries v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and

*Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). Plaintiff succeeds in making out a prima facie case of vicarious liability because Thomas was the Director of the ASTU and Gharzouzi's direct supervisor.

NHS may attempt to claim the affirmative defense provided for in *Faragher* and *Burlington Industries.* *Faragher* provides that "[w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence," if the employer can show "(a) that the employer exercise reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm or otherwise". *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275.

Viewing the record in the light most favorable to Plaintiff, we find that NHS cannot establish this defense by a preponderance of the evidence. First, there is a real dispute of fact as to whether tangible employment action was taken against Plaintiff. Second, given Plaintiff's allegations that Defendants retaliated against him because he lodged a discrimination complaint against Thomas, NHS cannot establish by a preponderance of the evidence that it took care to remedy the harassing behavior. Finally, with respect to the second *Faragher* requirement, Plaintiff has put forth sufficient evidence

to show that Gharzouzi lodged a complaint against Thomas with the corporate compliance hotline and to refute any argument by NHS that Gharzouzi failed to take advantage of the company's preventive or corrective avenues.

### vi. *Conclusion*

Although Plaintiff has offered sufficient evidence with respect to the first and fifth prongs of *Andrews,* Plaintiff fails to make out the necessary second, third and fourth *Andrews* prongs; thus, as a matter of law, his Title VII hostile work environment claim fails. Accordingly, we grant summary judgment in Defendants' favor on Plaintiff's Title VII hostile work environment claim.

### 2. *Retaliation Claim*

### a. *Burden Shifting Framework*

Title VII prohibits retaliation against employees who engage in a protected activity such as stating a claim of discrimination. *See* 42 U.S.C. § 2000e–3(a); *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 157 (3d Cir.1999). Where a Title VII plaintiff like Gharzouzi [17] does not rely on direct evidence of discrimination but instead presents indirect evidence of discrimination, the familiar burden-shifting test articulated in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), referenced *supra* at Section II, applies.[18] *See Walden v. Georgia–Pacific Corp.,* 126 F.3d 506, 512 (3d Cir.1997) (explaining that where the evidence put forth by plaintiff is

---

**17.** With respect to his retaliation claim, Gharzouzi does not style his case as a mixed motives, rather than a pretext, case; thus, it is not necessary to consider whether Plaintiff has adduced sufficient evidence proving that his employer acted unlawfully to justify the application of the mixed motives analysis.

**18.** "The order and allocation of burdens of proof in retaliation cases follow that of gener-

al disparate treatment analysis set forth in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)." *Sumner v. United States Postal Serv.,* 899 F.2d 203, 208 (2d Cir.1990).

so revealing of retaliatory animus that it is unnecessary to rely on the *McDonnell Douglas* burden-shifting framework). Under the burden-shifting framework, a Title VII plaintiff must first "prove by a preponderance of the evidence that a prima facie case of discrimination exists. Second, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, if defendant meets its burden, plaintiff must be given the opportunity to prove by a preponderance of the evidence that the legitimate reasons proffered by defendant were not its true reasons, but rather, a pretext for discrimination." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637–38 (3d Cir.1993) (internal quotations and citations omitted). Although the burden of production shifts, the ultimate burden of persuasion remains with the plaintiff at all times. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 698 (3d Cir.1995).

### b. *Prima Facie Case*

#### i. *Elements of Prima Facie Case*

To meet his burden of establishing a prima facie case of discrimination for purposes of his retaliation claim, Gharzouzi must demonstrate that: "(1) he engaged in conduct protected by Title VII; (2) the employer took adverse action against him; and (3) a causal link exists between his protected conduct and the employer's adverse action." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir.1994). "Plaintiff must also show that the persons who took the adverse employment action against [him] knew of the protected activity and acted with a retaliatory motive." *Nowosad v. Villanova Univ.*, No. 97–5881, 1999 WL 322486, at *3 (E.D.Pa. May 19, 1999).

#### ii. *Defendants' Position*

Defendants argue that Plaintiff cannot make out a prima facie case of retaliation.

(Defs.' Mot. for Sum. Judg. at 40–42.) Defendants first argue that Plaintiff did not engage in protected conduct. With respect to this first element of the prima facie case, they first suggest that Gharzouzi does not meet what is minimally required—that is, having a good faith, reasonable belief that a violation existed. Defendants contend in addition that none of the alleged incidents could reasonably be perceived as discriminatory and that Gharzouzi himself did not believe that the remarks were discriminatory in nature. Furthermore, defendants propose, Gharzouzi's discussions with Ciavardone and Fogle cannot be considered protected activity because Gharzouzi did not complain of discrimination by Thomas with respect to Gharzouzi's national origin specifically, as is required for such a complaint to be considered protected activity.

With respect to the third element of the prima facie case, Defendants argue that there was no causal link between his complaint and the decision to discharge him because the decision makers who made the decision to discharge Gharzouzi were independent of Thomas and because they made their decision based on complaints from staff members other than Thomas regarding Gharzouzi's support for the union and his treatment of staff members—complaints that were separate and unrelated to Gharzouzi's complaints of harassment by Thomas.

#### iii. *Protected Activity*

We first consider whether Gharzouzi engaged in protected activity. Title VII makes it an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–(3)(a). It is an unlawful

employment practice for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Accordingly, stating a claim of discrimination is protected conduct. "To establish that his activity is protected under Title VII, a plaintiff need not prove the merits of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

We note that a general complaint of unfair treatment does not translate into a charge of illegal discrimination, and is not protected conduct under Title VII. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701–02 (3d Cir.1995) (holding that the plaintiff's letter to the human resources department complaining of unfair treatment in general and not specifically complaining about age discrimination did not constitute protected activity). The complaint must specifically mention the plaintiff's belief that he/she was discriminated against on account of his/her membership in some protected class. *See id.* Nevertheless, what is significant is the "message that [the plaintiff] conveyed, and not the medium of conveyance." *Id.*, 63 F.3d at 702. A plaintiff is not required to write a formal letter of complaint to an employer or to the EEOC; acceptable forms of protected activity under Title VII also include informal protests of discriminatory employment practices, including making complaints to management. *See, e.g., Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

Plaintiff submits that he complained of discrimination based on his national origin specifically. Plaintiff contends in his Brief in Opposition to Defendants' Motion for Summary Judgment that in early September of 1999, he informed Thomas that he was going to make a complaint of discrimination and that when he spoke with both Ciavardone and Fogle a day later, he complained about Thomas's ethnic slurs. (Pls.' Response to Defs.' Mot. for Sum. Judg. at 17–18.) We find that the record supports Plaintiff's contentions that he mentioned specifically his belief that Thomas was discriminating against him on the basis of his national origin. Statements by Gharzouzi contained in the record support this. First, the EEOC Charge of Discrimination signed by Plaintiff under the penalty of perjury states Gharzouzi's belief that Thomas's comments "were motivated by [his] national origin and the prejudices he harbors to those of foreign birth" and that he "frequently complained to Mr. Thomas about his harassment of [him]." Gharzouzi also indicates in the EEOC Charge of Discrimination that he called the corporate compliance hotline on September 9, 1999 regarding his complaints against Thomas and spoke with Ciavardone, who referred Gharzouzi to Fogle, for whom Gharzouzi then left a message; the EEOC Charge also indicates that when Gharzouzi met with NHS management personnel on September 17, and 20, 1999, he tried to bring up his concerns regarding Thomas's harassment of him.

Most telling is the deposition testimony of several of the named defendants showing that Gharzouzi complained of discrimination based on his national origin and that Defendants knew of his complaints. Sheaffer testified in her deposition that she learned on September 10, 1999 that Gharzouzi had indicated to Fogle "that he had a complaint against Mr. Thomas having to do with his national origin." (S. Sheaffer Dep., Vol. I, at 107.) Likewise, Tezak mentioned that at some point during the investigation, he learned that Gharzouzi believed that Thomas discriminated against him due to his ethnic persuasion.

(A. Tezak Dep. at 140–41). Tezak also testified that it was reasonable to assume that Fogle had, prior to Tezak's September 20, 1999 meeting with Gharzouzi, at least heard the general allegation that Gharzouzi believed he was being discriminated against. (*Id.* at 138.) Similarly, Edwards testified that in the interview with Gharzouzi on September 20, 1999, Gharzouzi had "made to [her] some specific complaints of the way he felt he was being treated as a result of his ethnic background, his national origin." (J. Edwards Dep. at 34.)

Taking Plaintiff's allegations as true, we cannot say that he did not have a reasonable belief that he was being discriminated against. Furthermore, the record clearly indicates that both before he was suspended and throughout the investigation that took place prior to his discharge, he complained of his belief that Thomas had discriminated against him on the basis of his national origin. The record also shows that the individuals who decided to suspend and discharge Plaintiff, Tezak, Edwards, Sheaffer and Breslin, knew of the protected activity. Accordingly, we find that Gharzouzi has made out the first element of the prima facie case.

### iv. *Adverse Employment Action*

■ Plaintiff also succeeds in showing the second element, that his suspension and discharge constitute an adverse employment action taken against him. "Retaliatory conduct ... is ... proscribed by Title VII only if it alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her statues as an employee." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir.1997) (internal quotations and citations omitted). "Courts have operationalized the principle that retaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment into the doctrinal requirement that the alleged retaliation constitute 'adverse employment action.'" *Id.* Plaintiff's suspension and discharge constitute adverse employment action.[19] *See id.*

### v. *Causal Link*

■ Plaintiff also succeeds in establishing the necessary causal link to make out his prima facie case. "Plaintiff may demonstrate a retaliatory causal link in a number of ways: a close temporal proximity between the protected activity and the adverse employment action, evidence of intervening antagonism or retaliatory animus, or other circumstantial evidence that supports a causal inference, such as inconsistent or pretextual reasons given by the defendant for the termination." *Hussein v. Genuardi's Family Markets*, No. CIV.A. 00–CV–4905, 2002 WL 56248, at *9 (E.D.Pa. Jan. 15, 2002).

In *Farrell v. Planters Lifesavers Company*, 206 F.3d 271, 279 (3d Cir.2000), the Third Circuit noted that it had "spoken

---

**19.** Plaintiff may attempt to argue that Thomas's requiring him to obtain a doctor's note as a basis for his retaliation claim. We find that requiring Gharzouzi to obtain the note was not an adverse employment action. Plaintiff has failed to show that the requirement that he obtain a doctor's note altered the terms and conditions of his employment, deprived him of employment opportunities or adversely affected his status as an employee. *See Robinson*, 120 F.3d at 1300–01 (deciding that allegations that the plaintiff was subjected to "unsubstantiated oral reprimands" and "unnecessary derogatory comments" did not rise to the level of adverse employment action and cataloguing cases from other circuits in which the particular employment action did not constitute adverse employment action for purposes of the plaintiff's retaliation claim). Accordingly, this requirement does not provide a basis for his retaliation claim.

often of the probative value of temporal proximity in retaliation cases." Although Third Circuit cases preceding *Farrell* had remarked that "the case law is seemingly split as to whether temporal proximity between the protected activity and the alleged retaliatory act can be sufficient in itself to create an inference of a causal connection for the purposes of a prima facie case of retaliation," *Farrell* cautioned that "this 'split' is not an inconsistency in our analysis but is essentially fact-based." The court explained that it had "ruled differently on this issue in [its] case law, depending, of course, on how proximate the events actually were, and the context in which the issue came before [it]." *Id.* As the court recalled, in *Jalil v. Avdel Corporation,* 873 F.2d 701 (3d Cir.1989), it had "reversed the grant of summary judgment in favor of the defendant because the plaintiff had established causation for the purposes of his prima facie case merely by showing that his discharge occurred only two days after his employer had received notice of Jalil's EEOC claim." *Id,* 206 F.3d at 280. "However, in *Krouse,* also a case appealing the grant of summary judgment, [the court] explained that temporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not 'unusually suggestive,' and determined that nineteen months was too attenuated to create a genuine issue of fact." *Id.* As the Third Circuit clarified, "it is causation, not temporal proximity [or evidence of antagonism], that is an element of plaintiff's prima facie case, and temporal proximity [or antagonism] merely provides an evidentiary basis from which an inference can be drawn." *Id,* 206 F.3d at 281 (internal quotations and citations omitted).

Keeping these principles in mind, we find that for purposes of Plaintiff's prima

facie case, *see Farrell,* 206 F.3d at 279 n. 5 (noting that the relatively evidentiary impact of temporal evidence may vary depending on the stage of the *McDonnell Douglas* proof analysis), the temporal proximity between the protected activity and Plaintiff's suspension and discharge, along with the weaknesses that we see in Defendants' proffered reasons for Plaintiff's suspension and termination, *see infra* at Section IV.B.2.d.ii., supply the necessary causal link. Plaintiff allegedly told Thomas that he was going to complain about Thomas's treatment of him and then on September 9, 1999, called the corporate compliance hotline to lodge a complaint against Thomas. He spoke with Ciavardone and that day, pursuant to Ciavardone's suggestion, called Fogle and left a message for him. On the following day, Thomas called Sheaffer to complain about Gharzouzi and Sheaffer and Fogle thereafter decided to place Gharzouzi on administrative leave. On September 10, 1999, Fogle called Gharzouzi to inform him that he had been placed on administrative leave. Additionally, on September 17, and 20, 1999—less than a week before his discharge—Plaintiff again complained of discrimination. A collective decision to discharge him was made approximately one week later. We find that this is an instance where the short span of time between the protected activity and each of the allegedly retaliatory acts (his suspension and his termination) is "unduly suggestive" of retaliation. Furthermore, as discussed *infra* at Section IV.B.2.d.ii., there are weaknesses to Defendants' proffered reasons for the action taken against Plaintiff; these weaknesses provide an additional basis for finding a causal link between the protected activity and Plaintiff's suspension and discharge.[20]

---

**20.** Defendants attempt to argue that the causal link is lacking because the decision makers

who decided to suspend and terminate him

c. *Defendants' Legitimate, Non-discriminatory Reasons*

i. *Rebutting the Presumption: Defendants' Burden*

We find that Plaintiff has succeeded in making out a prima facie case of retaliatory discrimination. Gharzouzi's establishment of a prima facie case of retaliation creates a legally mandatory rebuttable presumption. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The presumption of retaliation that arises shifts the burden of production to the employer to rebut the prima facie case by producing "clear and reasonably specific" evidence that its actions were taken for legitimate, non-retaliatory reasons. *Id.,* 450 U.S. at 258, 101 S.Ct. 1089. Placing the burden of production on the employer serves to rebut Gharzouzi's prima facie case and to "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.,* 450 U.S. at 255–56, 101 S.Ct. 1089.

ii. *Defendants' Articulated Non-discriminatory Reasons*

 Defendants have articulated several reasons for placing Gharzouzi on administrative leave and for ultimately terminating him. NHS states that it suspended Gharzouzi "due to the complaints made about his decision and tactics over the roommate assignment and his possible involvement in the union's organizing campaign at the ASTU." (Defs.' Mot. for Sum. Judg. at 36.) NHS states that "the decision to terminate arose out of his lack of support for his employer's anti-union position and his intimidating tactics with staff, residents and his fellow administrators." (*Id.* at 37.)

iii. *Conclusion*

We find that Defendants have succeeded in meeting their burden. They have articulated legitimate, non-discriminatory reasons for their conduct (that Gharzouzi made an inappropriate decision to house two residents who were not physically and mentally compatible with one another in the same room; that Gharzouzi supported the formation of a union, contrary to the management's anti-union position; and that Gharzouzi intimidated staff members and was not a team player) and, through the deposition testimony of Sheaffer and others, have offered clear and reasonably specific evidence to support their reasons.

d. *Showing of Pretext*

i. *Plaintiff's Burden*

Once the employer meets its burden, the burden of production shifts back to the plaintiff who then has "the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. If the plaintiff produces sufficient evidence of pretext, he/she need not produce additional evidence of discrimination beyond his

were independent of Thomas. We note that the record shows that Thomas was not so separated from the actions taken against Gharzouzi as Defendants would have us believe. Indeed, it was Thomas who placed the call to Sheaffer that led to Gharzouzi's suspension.

Defendants also attempt to argue that the causal connection cannot be made because they made their decision to discharge Gharzouzi for reasons independent of Gharzouzi's complaints against Thomas. We note that there is nothing striking about the fact that they advanced independent reasons. In fact, it is necessary for Defendants to advance reasons separate from Gharzouzi's complaints of discrimination in order for them to meet to meet their burden. The fact that they advanced these reasons does not, as they suggest, dismantle Gharzouzi's prima facie case.

prima facie case for the case to proceed to trial. *See Sempier v. Johnson & Higgins,* 45 F.3d 724, 731 (3d Cir.1995). For purposes of showing pretext, it is not necessary for the plaintiff to demonstrate that the illegitimate factor was the sole reason for the termination, but that it was "a determinative factor." *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). At the summary judgment stage, a plaintiff need not prove that the employer's purported reason for its actions was false, "but the plaintiff must criticize it effectively enough so as to raise a doubt as to whether it was the true reason for the action." *Nosowad v. Villanova Univ.,* No. 97–5881, 1999 WL 322486, at *5 (E.D.Pa. May 19,1999). The plaintiff can meet its burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* As the Third Circuit has recognized,

> there will seldom be eyewitness testimony as to the employer's mental processes. Where direct 'smoking gun' evidence of discrimination is unavailable, this court has found that the proper inquiry is whether evidence of inconsistencies and implausibilities in the employer's proffered reasons for discharge reasonably *could* support an inference that the employer did not act for nondiscriminatory reasons, not whether the evidence *necessarily* leads to [the] conclusion that the employer did act for discriminatory reasons.
>
> *Josey v. Hollingsworth Corp.,* 996 F.2d 632, 638 (3d Cir.1993) (internal quotations and citations omitted).

The Third Circuit has found that various factors, such as the defendant's credibility, the timing of an employee's dismissal and the employer's treatment of the employee, can raise an inference of pretext which would make summary judgment for the employer inappropriate. *Id.,* 996 F.2d at 638–39.

ii. *Plaintiff's Showing*

■ We consider Plaintiff's response to each of the reasons proffered by Defendants' for Gharzouzi's suspension and termination. First, we find that Plaintiff has sufficiently criticized Defendants' explanation based on the room assignment. Taking Plaintiff's allegations as true, the decision to place the two individuals in the same room was made by the entire team and no one in the meeting objected to the move. (N. Gharzouzi Dep. at 87–88; S. Sheaffer Dep. at 165.) There is no showing that any team member other than Gharzouzi was reprimanded, let alone suspended, for participating in this decision. Additionally, upon learning of the room assignment, Thomas did not immediately separate the two residents. (R. Thomas Dep. at 81.) The fact that he allowed them to remain in the room overnight suggests that the assignment was no so serious as to warrant Gharzouzi's suspension and, ultimately, his discharge. Furthermore, according to Gharzouzi, he followed Thomas's directive and thereafter made the room change. (N. Gharzouzi Dep. at 89–90.) Even if the assignment indicates a lapse of judgment that can be attributed to Gharzouzi, according to Gharzouzi, he complied with Thomas's commands and made the change; a reasonable juror could thereby infer that this incident did not warrant his suspension and termination. In addition, there is no evidence that Thomas took action against Gharzouzi because of the room assignment until after Gharzouzi complained that Thomas was harassing him (S. Sheaffer Dep. at 103); a juror could infer that if the assignment really signaled a problem, Thomas would have reported it immediately. Most importantly, Sheaffer indicated in her deposition that she and Fogle planned on investi-

gating only the union issue and not the room assignment. (S. Sheaffer Dep. at 106.) Had there been a real concern over the assignment, it stands to reason that they would have planned from the start of the investigation to investigate this issue as well. This suggests that this reason for Gharzouzi's suspension could be pretextual. Sheaffer also indicated that they investigated mainly just the union issue and not the room assignment issue. (S. Sheaffer Dep. at 169, 173.) Despite the fact that Defendants state that the seriousness of this issue compelled Gharzouzi's discharge, the fact that they barely investigated it supports the argument that this was not the real reason for his discharge. Given the inconsistencies surrounding this reason proffered by Defendants, we find that a jury could find it to be pretextual.

Turning to the union issue, opposing the evidence offered by Defendants that Gharzouzi made pro-union statements to staff members contrary to the management's anti-union position is evidence offered by Plaintiff that he did not in fact support the formation of a union. Plaintiff himself denies providing the union number to staff members and denies making disparaging remarks regarding the company's efforts to resist the formation of a union. (N. Gharzouzi Dep. at 116.) Plaintiff also points to the statements of several staff members who stated that Gharzouzi refused to talk about union issues with them. (Pls.' Response to Defs.' Mot. for Sum. Judg. at 7–8.) Plaintiff also offers Sheaffer's deposition testimony where she indicates that Gharzouzi denied supporting the union and that she found him to be credible on this issue. (S. Sheaffer Dep. at 135, 146.) A juror could reasonably infer from this evidence that Gharzouzi was not actively involved in the formation of the union and did not take an anti-management position justifying his discharge. Moreover, we find it probative that Thomas did not report Gharzouzi's possible union activ-

ity until September 10, 1999, a day after Gharzouzi called the compliance hotline to complain about Thomas's discrimination against him. The proximity in time between Gharzouzi's call and Thomas's report suggests that Gharzouzi's involvement with the union may not have been the actual reason for his suspension. We find that a jury could infer this reason proffered by Defendants was pretextual with respect to both Gharzouzi's suspension and discharge.

Lastly, Defendants justify their decision to terminate Gharzouzi on the grounds that Gharzouzi had used intimidating tactics with staff members, residents and fellow administrators as a reason for Gharzouzi's termination. We are cognizant of the fact that in order to discredit this reason, Gharzouzi cannot simply show that his employer was wrong or mistaken because the factual dispute at issue is not whether the employer's decision was wise or competent, but is whether discriminatory animus motivated the employer. *See Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994). Instead, the record is examined for evidence of inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons. *Sempier*, 45 F.3d at 731. We believe that Plaintiff has sufficiently discredited this reason. The fact that Gharzouzi had been promoted in January of 1999, just nine months before his termination suggests that Plaintiff's poor performance and difficulty interacting with others may not be a genuine reason for his discharge. *See, e.g., Levin v. Analysis & Tech., Inc.*, 960 F.2d 314, 317 (2d Cir.1992) (finding that the plaintiff raised genuine triable issues of fact with regard to whether the employer's stated reason that the plaintiff had a bad attitude was pretextual where the plaintiff presented evidence that "his irascible nature had for many years been accepted by his co-workers and supe-

riors"); *Giacoletto v. Amax Zinc Co., Inc.,* 954 F.2d 424, 426–27 (7th Cir.1992) (finding that despite strong evidence that the plaintiff was rude and uncommunicative, jury was entitled to find that this was not the real reason for his discharge where he was kept as a supervisor for 14 years even though he had received negative performance evaluations before). Furthermore, even if Gharzouzi's behavior on occasion caused Thomas to reprimand him, any difficulties that Thomas encountered because of Gharzouzi's conduct were not raised administratively until *after* Gharzouzi lodged his complaint against Thomas. The temporal proximity between Gharzouzi's complaint and Thomas's complaint lends support to the inference that this reason might not be the actual reason for his termination. We find that a reasonable juror could conclude that this final reason for Plaintiff's termination was also pretextual.

For purposes of this summary judgment motion, given the temporal proximity between Gharzouzi's complaint against Thomas and Gharzouzi's suspension and discharge [21], *see Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279 n. 5 (3d Cir.2000) (noting a difference between a plaintiff relying upon temporal proximity to satisfy her prima facie case for the purpose of summary judgment and to reverse a verdict), and the implausibilities surrounding Defendants' proffered reasons for Gharzouzi's suspension and termination, we find that Plaintiff has sufficiently discredited Defendants' proffered non-discriminatory reasons. Accordingly, we will deny Defendants' Motion for Summary Judgment with respect to Plaintiff's Title VII retaliation claim.

### C. PHRA Claims

As noted *supra* at Section IV.A.3.c., Plaintiff's PHRA claims remain only against Defendants NHS and Thomas.

Generally, the PHRA is applied in accordance with Title VII, *see Davis v. Sheraton Society Hill Hotel,* 907 F.Supp. 896, 899 n. 1 (E.D.Pa.1995), and the analysis that guides judicial decision-making under Title VII applies to decision-making under the PHRA. Accordingly, for the reasons discussed *supra* at Section IV.B., we grant summary judgment in Defendants' favor with respect to Plaintiff's PHRA hostile work environment claim and disparate treatment claim; we deny summary judgment as to Defendants NHS and Thomas with respect to Plaintiff's PHRA retaliation claim.

### D. Intentional Infliction of Emotional Distress Claim

Count V of Plaintiff's complaint states a claim for intentional infliction of emotional distress. Defendants have moved for summary judgment with respect to this claim on several grounds. Plaintiff, however, has indicated that he is no longer proceeding on the claim for intentional infliction of emotional distress because he did not receive medical treatment for emotional distress and therefore will not be able to present expert testimony on the emotional distress issue. (Pls.' Response to Defs.' Mot. for Sum. Judg. at 2 fn. 1.) Accordingly, we grant summary judgment in Defendants' favor with respect to Plaintiff's intentional infliction of emotional distress claim.

An appropriate order follows.

---

**21.** We note also that "evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the *McDonnell Doug-* *las* formula requires us to ration the evidence to one stage or the other." *Farrell,* 206 F.3d at 286.

*ORDER*

AND NOW, this 6th day of May, 2002, upon consideration of Defendants' Motion for Summary Judgment, filed on March 19, 2002; Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, filed on April 12, 2002; and Defendants' Reply Brief in Support of Motion for Summary Judgment, filed on April 17, 2002, consistent with the foregoing Opinion, it is hereby ORDERED:

1. Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART as follows:

 a. Defendants' Motion for Summary Judgment on the grounds that the federal claims against Northwestern Human Services of Pennsylvania are time-barred is DENIED;

 b. Defendants' Motion for Summary Judgment with respect to Plaintiff's Title VII claims is:

 i. GRANTED as to Plaintiff's hostile work environment claim;

 ii. GRANTED as to Plaintiff's disparate treatment claim;

 iii. DENIED as to Plaintiff's retaliation claim;

 c. Defendants' Motion for Summary Judgment with respect to Plaintiff's PHRA claims is:

 i. GRANTED as to all Defendants with respect to Plaintiff's hostile work environment claim;

 ii. GRANTED as to all Defendants with respect to Plaintiff's disparate treatment claim;

 iii. GRANTED as to Defendants Ciavardone, Fogle, Sheaffer, Tezak and Edwards with respect to Plaintiff's retaliation claim;

 iv. DENIED as to Defendants Northwestern Human Services of Pennsylvania and Thomas with respect to Plaintiff's retaliation claim;

 d. Defendants' Motion for Summary Judgment with respect to Plaintiff's claim for intentional infliction of emotional distress damages is GRANTED.